**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ABED EL WAHAB MAHMOUD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 25 C 12603** |
| | ) | |
| **GALLAGHER BASSETT** | ) | |
| **SERVICES, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

Abed El Wahab Mahmoud has sued his former employer, Gallagher Bassett

Services, Inc., alleging that Gallagher unlawfully terminated his employment based on

his religion, national origin, and protected speech. Gallagher has moved to compel

Mahmoud to submit his claims to arbitration. For the reasons below, the Court enters

and continues Gallagher's motion pending a trial regarding whether there was an

agreement to arbitrate.

### Background

Mahmoud received an offer of employment from Gallagher on June 27, 2022.

The next day, he received an email to complete an onboarding process through Taleo,

an electronic onboarding system, which Gallagher required of all new hires. Mahmoud

completed the Taleo onboarding process and began working for Gallagher on July 11,

2022. The parties dispute whether Mahmoud agreed to an arbitration agreement

through that process.

According to Gallagher, the Taleo onboarding process required Mahmoud to view and acknowledge an arbitration agreement that purported to be effective unless he opted out within thirty days. In support of this contention, Gallagher provides an affidavit from its Global Human Resource Compliance Leader, Stacy Fields, who has worked for Gallagher since 2021.

According to Fields, the Taleo process included two arbitration-related tasks. She states that when an employee clicked on the first task, the following notice was displayed:

> **NOTICE TO ALL APPLICANTS:** Individuals who wish to be considered for employment by Arthur J. Gallagher and any related companies must read and acknowledge receipt of the following Mutual Arbitration Agreement ("Agreement"). This Agreement is effective on the first date of your employment unless you exercise your right to opt out. You may opt-out of this Agreement by delivering a completed and signed Opt-Out Form within 30 days of your start date. After you acknowledge your receipt and understanding of this Agreement below, you will be presented with the Opt-out form and submission instructions.

Ex. 1, ¶ 14.

Fields attests that the arbitration agreement appeared in full below this notice. Her affidavit includes what she contends were the terms of the agreement. Three terms are relevant to the present motion. First, the coverage provisions stated that Gallagher and the employee "agree[d] to resolve any and all claims, disputes or controversies arising out of or relating to" the employment, including the application or termination process. *Id*. ¶ 15. According to a "Covered and Non-Covered Claims" section, the arbitration agreement covered claims of "discrimination or harassment on the basis of race, sex, age, national origin, religion, disability or any other unlawful basis; breach of contract; unlawful retaliation; [and] wrongful discharge." *Id*.

2

Second, the arbitration agreement contained a delegation clause assigning questions of whether to arbitrate to arbitration. That clause provided in relevant part that "[t]he Arbitrator, and not any federal, state, or local court or agency, will have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of this Agreement, including without limitation any claim that this Agreement is void or voidable." *Id.*

Third, the arbitration agreement contained an acknowledgment provision at the end. It stated, in full:

> **ACKNOWLEDGEMENT** [sic]**:** You are acknowledging your receipt and review of this Agreement. Provided that you do not exercise your right to Opt Out (as set forth above and with submission instructions to follow), you are agreeing to be bound to this Agreement, as does GB effective on the first day of your employment. You understand that, as more fully set forth above, you must arbitrate any and all employment-related claims against GB and that you may not file a lawsuit or pursue a jury trial in court in regard to any claims or disputes covered by this Agreement.

*Id.*

Next, Fields attests, "the Taleo system presented a separate task titled 'Mutual Arbitration Agreement Opt-Out Form,'" which provided opt-out instructions and a link to print and download an opt-out form. *Id.* ¶ 16. Fields asserts that "[a]pplicants who wished to opt out were instructed to complete and return the form to the designated email address within thirty (30) days." *Id.*

According to Fields, Gallagher discontinued the Taleo system in or around December 2023, but before doing so, it performed a full data extraction to preserve onboarding records. Fields states that those files "are stored in a secure SharePoint, accessible only to a limited number of authorized HR compliance personnel," including Fields herself, and that "Gallagher located Mahmoud's Taleo onboarding record by

referencing the master candidate list and identifying his unique candidate number and file location." *Id.* ¶¶ 18–19.  That file, Fields asserts, "contained a complete record of the onboarding tasks Mahmoud completed in 2022, including date and time stamps." *Id.* ¶ 20.

Based on Fields's review of Mahmoud's Taleo record, "Mahmoud opened the Gallagher Mutual Arbitration task on June 28, 2022 at or around 3:48pm" and completed it an hour later.  *Id.* ¶¶ 21–22.  According to Fields, he opened the opt-out task at or around 4:50pm and completed it a minute later.  *Id.* ¶¶ 24–26.  She avers that, through this process, Mahmoud would have viewed the arbitration agreement and been presented with an opt-out form.  But, she says, Gallagher has no record of receiving an opt-out form from Mahmoud.  Fields thus attests that her record review based on "Gallagher's standard procedure . . . confirmed that the Taleo data for Mahmoud includes completion of the Arbitration Agreement acknowledgment task but no record of any submitted or completed Opt-Out Form."  *Id.* ¶ 31.

Mahmoud remembers things differently.  In an affidavit of his own, he declares, under penalty of perjury, that he "never received or saw an arbitration agreement."  Ex. A, ¶ 10.  He similarly avers that he "did not type [his] name into any specific box, clicked [sic] any affirmative assent button, or otherwise executed [sic] any separate Mutual Arbitration Agreement in the Company's onboarding portal."  *Id.* ¶ 14.

Mahmoud further attests that he "did not receive any Arbitration Opt-Out Form," "was never provided an Opt-Out Form or any notice of an opportunity to opt out of arbitration within any time period," and "was not advised of any right to opt out of arbitration."  *Id.* ¶¶ 11–12, 16.  Mahmoud concludes that, "[b]ased on [his] information,

4

[he] went through onboarding for approximately one hour on June 28, 2022, but there was no presentation, review, or execution of a Mutual Arbitration Agreement." *Id.* ¶ 30.

According to the complaint, Gallagher summarily terminated Mahmoud's employment on February 20, 2025 after it received an anonymous external complaint about his social media posts expressing pro-Palestine views regarding the Israel-Palestine conflict in Gaza.

Mahmoud sued Gallagher in state court, alleging that Gallagher's termination decision breached his employment contract and violated 42 U.S.C. § 1981 and Title VII of the Civil Rights Act. Gallagher removed the case to federal court and has now moved to compel arbitration.

## Discussion

The Federal Arbitration Act (FAA) directs courts to enforce arbitration agreements according to their terms. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 506 (2018). Section 2 of the FAA is the "primary substantive provision of the Act." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010). It provides in relevant part that "[a] written provision . . . to settle by arbitration a controversy . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 2 thus places arbitration agreements on an equal footing with other contracts: they must be enforced according to their terms but may be invalidated by "generally applicable contract defenses, such as fraud, duress, or unconscionability." *Rent-A-Ctr.*, 561 U.S. at 67–68.

The FAA "also establishes procedures by which federal courts implement § 2's substantive rule." *Id.* at 68. Section 3 requires a court, upon application by a party, to

stay proceedings if the parties have agreed to arbitrate an issue in dispute. 9 U.S.C. § 3; *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024). Section 4 permits a party to petition a court for an order compelling arbitration. 9 U.S.C. § 4. If the court is "satisfied that the making of the agreement for arbitration . . . is not in issue," it "shall" order "arbitration in accordance with the terms of the agreement." *Id.* But "if the making of the arbitration agreement [is] in issue, the court shall proceed summarily to the trial thereof." *Id.*

In determining whether "the making of the agreement for arbitration" is "in issue," a court applies a standard akin to that for summary judgment under Rule 56 of the Federal Rules of Civil Procedure: the party opposing arbitration must demonstrate a genuine dispute of material fact warranting trial. *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002).

Mahmoud resists arbitration on two grounds. First, he argues that no agreement to arbitrate was formed. Second, he contends that an agreement formed by his failure to opt-out would be procedurally unconscionable.

## A. Delegation

Before deciding whether this dispute is arbitrable, the Court must first decide the threshold question of who—the Court or the arbitrator—should decide arbitrability. That question is itself one of contract. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019). The Supreme Court has "consistently held that parties may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by 'clear and unmistakable' evidence."[1] *Henry Schein*, 586 U.S. at

---

[1] The "clear and unmistakable" requirement reflects a presumption about the parties' intent—that they likely did not focus on the "rather arcane" question of who should

69.  That is because "[a]n agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other."  *Rent-A-Ctr.*, 561 U.S. at 70.

In Gallagher's view, that settles the question.  By its account, the arbitration agreement contained a broad and clear delegation of "any dispute relating to the interpretation, applicability, enforceability, or formation of this Agreement, including without limitation any claim that this Agreement is void or voidable."  Def.'s Reply at 4 (quoting Ex. 1, ¶ 15).  According to Gallagher, even Mahmoud's argument that no contract was formed at all "does not avoid delegation, it triggers it."  *Id.*

That is mistaken.  A delegation clause, like any other arbitration agreement, is a type of contract.  As a result, it is subject to "the first principle that underscores all . . . arbitration decisions[:]  arbitration is strictly a matter of consent."  *Coinbase, Inc. v. Suski*, 602 U.S. 143, 148 (2024) (cleaned up).  "Arbitration is 'a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration.'"  *Id.*  If Mahmoud is right that no contract was formed, then the parties have not agreed to arbitrate their dispute or delegate the question of arbitrability, and he is entitled by default to a decision by a court.  *Id.* at 149.  Accordingly, the Court, and not an arbitrator, must decide his challenge to contract formation.  *See K.F.C. v. Snap Inc.*, 29 F.4th 835, 837 (7th Cir. 2022) ("Even the most sweeping delegation cannot send the contract-formation issue to the arbitrator, because, until the court rules that a contract

---

decide arbitrability.  *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944–45 (1995); *see Rent-A-Ctr.*, 561 U.S. at 69 n.1.

exists, there is simply no agreement to arbitrate.").

Several of the arguments that Mahmoud asserts under the heading of procedural unconscionability essentially restate his contention that no arbitration agreement was formed. He first asserts that "[u]nder Illinois law, an opt-out procedure does not constitute assent, particularly where the employee may never have received the opt-out materials." Pl.'s Resp. at 13. Similarly, he states that "Illinois courts do not enforce agreements formed by silence unless there is a duty to speak" but that "[n]o such duty existed here." *Id.* Finally, he reiterates that he "attests that he never received the opt-out form." *Id.* These claims, in substance, mirror Mahmoud's formation arguments and thus are for the Court to decide.

To the extent that Mahmoud asserts procedural unconscionability as a separate defense from his contention that no contract was formed, this implicates a second principle: the severability rule. That rule establishes that "as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006). As a result, a validity challenge to a different provision of the contract, or to the contract as a whole, is irrelevant to the question of whether a specific arbitration provision within the contract is enforceable. *Rent-A-Ctr.*, 561 U.S. at 70. Instead, a party resisting arbitration with a validity challenge, as opposed to a challenge to formation, must direct the challenge to the specific arbitration agreement at issue. *Id.* at 70–72.

The Supreme Court established that rule in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967), where the plaintiff sought to avoid arbitration on the basis that there was fraud in the inducement of the contract containing the arbitration

agreement. *Id.* at 398–99. The Court held that a court could adjudicate a more specific claim of fraud in the inducement of the arbitration clause itself, but not the plaintiff's claim of fraud in the inducement of the contract generally. *Id.* at 403–04.

The Court clarified two important aspects of the severability rule in *Rent-A-Center*. There, the plaintiff contended that his arbitration agreement with Rent-A-Center was unconscionable under Nevada law, which required a showing of both procedural and substantive unconscionability. *Rent-A-Ctr.*, 561 U.S. at 73. Rent-A-Center argued, however, that a delegation clause nested within the arbitration agreement assigned disputes about the enforceability of the agreement to arbitration. *Id.* at 66.

The Court, applying the severability rule, agreed. *Id.* at 72. First, the Court made clear that even where the validity challenge applies "equally" to the specific arbitration agreement—"as in *Prima Paint* itself, where the alleged fraud that induced the whole contract equally induced the agreement to arbitrate"—the Court "nonetheless require[s] the basis of challenge to be directed specifically to the agreement to arbitrate." *Id.* at 71. Second, it held that the delegation provision was severable from the rest of the arbitration agreement, and thus the plaintiff had to direct his challenge specifically to the delegation provision. *Id.* at 72. As the Court explained, the fact that "the underlying contract is itself an arbitration agreement . . . makes no difference." *Id.* "[U]nless [the party resisting arbitration] challenge[s] the delegation provision specifically, we must treat it as valid under § 2, and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the Agreement as a whole for the arbitrator." *Id.*

Applying those principles, the Court in *Rent-A-Center* held that the plaintiff had challenged the arbitration agreement as a whole, not the delegation provision. *Id.* It

observed that none of the plaintiff's substantive unconscionability challenges targeted the delegation provision alone. *Id.* at 73–74. Because the plaintiff had to prove both procedural and substantive unconscionability to invalidate the delegation provision under Nevada law, the Court held that the plaintiff's unconscionability challenge was delegated to the arbitrator without analyzing the plaintiff's procedural unconscionability arguments. *Id.* at 73.

The Court most recently addressed the severability rule in *Coinbase*, where the parties disputed whether another agreement superseded their arbitration agreement. *Coinbase*, 602 U.S. at 145. There, the Court cited *Rent-A-Center* for the proposition that "where a challenge applies 'equally' to the whole contract and to an arbitration or delegation provision, a court must address that challenge." *Id.* at 151 (quoting *Rent-A-Ctr.*, 561 U.S. at 71). In isolation, that statement may appear to depart from *Rent-A-Center*'s requirement that a validity challenge must be specifically directed to a delegation provision. But in context, the Court likely was responding to a perceived circuit split about whether *Rent-A-Center* permits a party to use the same argument to challenge both the agreement as a whole and the delegation provision. *See Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1009–11 (9th Cir. 2023). The Supreme Court's statement clarifies that a party may do so.[2] *See Coinbase*, 602 U.S. at 151 (stating that

---

[2] This reading also makes sense of why *Coinbase* quoted *Rent-A-Center*'s use of the word "equally." That word appears exactly once in *Rent-A-Center*, in its explanation that even where a challenge to the contract as a whole applies "equally" to the arbitration agreement, the Court "nonetheless require[s] the basis of challenge to be directed specifically to the agreement to arbitrate." *Rent-A-Ctr.*, 561 U.S. at 71. Quoting that language would be anomalous if the Court in *Coinbase* intended to overturn that very rule. But it makes sense to show that *Rent-A-Center* itself contemplated that a challenge may be considered by a court rather than an arbitrator—

the severability rule "does not require that a party challenge *only* the arbitration or delegation provision").

Moreover, nothing else in *Coinbase* suggests an intent to overrule *Rent-A-Center*. To the contrary, the Court positively cited *Rent-A-Center* and reaffirmed its application in cases like this one, where there is only one contract containing a delegation provision: "In cases where parties have agreed to only one contract, and that contract contains an arbitration clause with a delegation provision, then, absent a successful challenge *to the delegation provision*, courts must send all arbitrability disputes to arbitration." *Id.* at 152 (emphasis added). Additionally, the Court noted in *Coinbase* that the validity challenge had been directed specifically to the delegation provision. *Id.* at 151 n.*. *Coinbase* thus did not present an occasion to revisit the *Rent-A-Center* rule.

The Supreme Court "does not overturn its precedents lightly." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 798 (2014). And it "does not normally overturn, or so dramatically limit, earlier authority *sub silentio*." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000). Reading *Coinbase* to overrule *Rent-A-Center* would ignore these principles.[3] In short, it remains true that a validity challenge must be directed specifically to the delegation provision to avoid being delegated to arbitration.

Mahmoud did not do so. Indeed, this case is nearly identical to the situation in

---

so long as it is directed to the arbitration agreement—even if it applies "equally" to the contract as a whole and to the arbitration agreement.

[3] And it would be especially unusual because *Rent-A-Center*'s rule was hotly contested by four Justices. *See Rent-A-Ctr.*, 561 U.S. at 76–88 (2010) (Stevens, J., dissenting). It would also mean that three of the Justices in the *Rent-A-Center* majority had a change of heart in joining the unanimous opinion in *Coinbase*.

*Rent-A-Center*.  Mahmoud's brief "note[s] the existence of the delegation provision, . . . but his unconscionability arguments ma[k]e no mention of it."  *Rent-A-Ctr.*, 561 U.S. at 74.  That omission is even more apparent in light of the fact that Mahmoud does specifically direct his formation arguments to the delegation clause.  *See* Pl.'s Resp. at 6 ("Plaintiff never agreed to delegate the decision of whether to arbitrate . . . .").

The only distinguishing factor is that Mahmoud's unconscionability challenge is grounded in procedural unconscionability alone, which the Court in *Rent-A-Center* declined to address because Nevada law required a showing of both procedural and substantive unconscionability.  Illinois law, however, requires only one or the other. *See, e.g.*, *Razor v. Hyundai Motor Am.*, 222 Ill. 2d 75, 99, 854 N.E.2d 607, 622 (2006). The question then is whether procedural unconscionability goes to formation or validity.

The Court need not answer that question in the abstract.  As discussed above, some of Mahmoud's procedural unconscionability arguments clearly challenge formation and must be decided by the Court.  *Cf. AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 355 n.* (2011) (Thomas, J., concurring) (suggesting that at least some unconscionability challenges are defenses to formation).  But to the extent that Mahmoud accepts, for purposes of argument, that he has agreed to arbitrate but asserts that the agreement should not be enforced due to procedural unconscionability, that is a validity challenge that had to be directed specifically to the delegation provision in order for the Court to be able to decide it.  *See Rent-A-Ctr.*, 561 U.S. at 69 n.1 (characterizing a claim that an agreement is "void for unconscionability" as relating to the agreement's validity).  Because it was not, it is delegated to the arbitrator.

**B.     Formation**

With that established, the Court turns to the question it must decide:  whether the parties agreed to arbitration.  As discussed above, if there is a genuine dispute of material fact warranting trial regarding that question, the Court must proceed to a trial regarding whether there was an agreement to arbitrate.  *Tinder*, 305 F.3d at 735.  At this stage, the Court concludes that such a dispute exists.

State law governs contract formation.  *K.F.C.*, 29 F.4th at 837.  The parties agree that Illinois law applies here.  The "basic ingredients" of a contract are mutual assent (an offer and an acceptance) and consideration.  *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 712 (7th Cir. 2019) (applying Illinois law).  The parties dispute whether there was mutual assent, a question that is determined via the parties' objective manifestations of intent.  *See id.* at 711.  As a result, a party's failure to opt out of an agreement may be construed as an acceptance "if the circumstances make it reasonable to do so."  *Id.* at 713.

If Gallagher's account of the Taleo onboarding process is accurate, that process may have sufficed to form a contract under Illinois law.  *Cf. id.* at 713–15 (holding that an employee's failure to opt out created an arbitration agreement with his employer because he received adequate notice and a reasonable opportunity to opt out).  But Gallagher's only evidence supporting its account is Fields's affidavit.  And though Fields purports to reproduce the terms of the arbitration agreement, the affidavit lacks sufficient detail about how that information was presented to remove this issue from the realm of genuine dispute.

As the Seventh Circuit has cautioned, determination of whether the terms of an

13

agreement are adequately presented over the internet "is a fact-intensive inquiry." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034–35 (7th Cir. 2016).  It requires consideration of factors such as "(1) the simplicity of the screen; (2) the clarity of the disclosure; (3) the size and coloring of the disclosure's font; (4) the spatial placement of the hyperlink; and (5) the temporal relationship to the user's action."  *Domer v. Menard, Inc.*, 116 F.4th 686, 695 (7th Cir. 2024).  Fields's affidavit addresses some of those factors.  She says, for example, that the agreement's terms appeared in full below the notice, and she appears to indicate which portions of the agreement were bolded or listed in all caps.  But she does not clearly say, for example, whether Mahmoud would have had to scroll to see all the terms of the arbitration agreement, or what font size was used.  And her affidavit sheds little light on factors that are harder to capture through written explanation, such as the clarity of the disclosure.

Fields's affidavit also leaves open questions regarding how she confirmed that Mahmoud went through this process.  She states, for example, that Gallagher performed a full data extraction to preserve onboarding records, but she does not explain how Gallagher did that.  If that process was unreliable, then the records may be inaccurate.  Similarly, Fields asserts that she accessed Mahmoud's records with his candidate number from a master candidate list, but there is no way to tell from her affidavit whether she did so reliably or to verify that the list was adequately maintained.

These details matter at this stage.  Mahmoud has filed an affidavit in which he denies having ever received the arbitration agreement or an opportunity to opt out.  To be sure, some of what Mahmoud says rests on his view of what constitutes acceptance or adequate notice under the law.  *See, e.g.*, Ex. A, ¶ 13 ("I was not presented with any

14

clear, conspicuous notice . . . ."); *id.* ¶ 14 ("I did not type my name into any specific box, clicked [sic] any affirmative assent button, or otherwise executed [sic] any separate Mutual Arbitration Agreement . . . ."). The same is true of much of his briefing. *See, e.g.*, Pl.'s Resp. at 9 ("Defendants cannot identify any action by Plaintiff that constitutes actual acceptance."). To the extent that those assertions "craftily skirt[] around a factual issue," they do not create a triable factual dispute. *Baker v. Santander Consumer USA*, No. 18 C 7365, 2019 WL 4750287, at *3 (N.D. Ill. Sep 30, 2019) (citing *Tinder*, 305 F.3d at 735–36).

But these assertions highlight, via contrast, Mahmoud's statements that can only be read as contesting Gallagher's factual assertions. For example, Mahmoud affirmatively declares, under oath, that he "never received or saw an arbitration agreement." Ex. A ¶ 10. In his brief, he repeats that factual contention without any added qualification. Pl.'s Resp. at 2 ("Plaintiff's affidavit shows that he never saw or reviewed any arbitration agreement [and] never received an opt-out form."). And at this stage, that is likely the only way that Mahmoud could contest Gallagher's account. If, for example, Gallagher had used the wrong candidate number when reviewing its records, Mahmoud would not be privy to that fact.

What the Court has before it is akin to a swearing match. Gallagher has not reproduced the Taleo system; instead, it has produced an affidavit saying, essentially, that Mahmoud would have had to review the arbitration agreement and opt-out instructions. Mahmoud denies that was the case. At this stage, the Court cannot "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *See Craftwood II, Inc. v.*

*Generac Power Sys., Inc.*, 63 F.4th 1121, 1129 (7th Cir. 2023). The way to resolve that dispute is by trial.[4]

## Conclusion

For the reasons stated above, the Court enters and continues Gallagher's motion to compel arbitration [dkt. 117] pending a trial on the question of whether the parties formed an agreement to arbitrate. The case is set for a telephonic status hearing on March 11, 2026 at 9:00 a.m. to discuss whether the trial on this issue will be a jury or a bench trial and to set a prompt trial date. The following call-in number will be used: 650-479-3207, access code 2305-915-8729.

Date: March 5, 2026

_____
MATTHEW F. KENNELLY
United States District Judge

---

[4] In light of the Court's conclusion, Gallagher's request for costs is inappropriate for resolution at this time.